IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Vorys, Sater, Seymour and Pease LLP, | : | |
| Plaintiff | : | Civil Action 2:12-cv-01072 |
| v. | : | |
| IP of A Columbus Works 1, LLC, *et al.*, | : | Magistrate Judge Abel |
| Defendants | : | |

# DECISION

This matter of before the Court on plaintiff Vorys, Sater, Seymour and Pease LLP's ("Vorys") motion for summary judgment (doc. 36). Vorys seeks to recover $251,130.62 for professional services, expenses and disbursements from defendants IPofA Columbus Works 1 through 6, 8 through 18, 21 through 23, 25, 27 through 29, 31 and 32. Defendants seek a set-off based on their claim for legal malpractice.

### I.      Background

This lawsuit arises out of Vorys' representation of IPofA Columbus Works 1 through 32, who owned, as tenants in common ("TICs"), a property located at 6200 East Broad Street, Columbus, Ohio. That property had been owned by entities controlled by Edward H. Okun. In 2005, IPofA Columbus Works acquired 6200 East Broad. That entity leased the property through a master lease to IPofA Columbus Works Leaseco,

LLC ("Leaseco").[1] This master lease was subject to an existing December 2003 lease by which Lucent Technologies, Inc. ("Lucent") occupied the property.[2] As owners of the property, the TICs received an undivided interest in the master lease; but they assigned their interest in the Lucent lease to Leaseco.[3]

Columbus Works Virginia Trust executed a promissory note, mortgage, security agreement, and fixture filing evidencing a $27 million loan from it to IPofA Columbus Works. That same year, the 32 TICs purchased 6200 East Broad for $25 million plus the assumption of the $27 million loan from Columbus Works Virginia Trust to IPofA Columbus Works.[4]

In May 2006, Cordell Funding, LLLP ("Cordell") loaned $26.5 million to Sam Trustee Services, LLC ("Sam Trustee") in Sam Trustee's capacity as trustee for Columbus Works Virginia Trust. This loan was secured by a security interest in the note and mortgage securing Columbus Works Virginia Trust's purported $27 million loan to IPofA Columbus Works.[5] In May 2007, Sam Trustee defaulted on the $26.5 million loan from Cordell.[6] In July 2007, Sam Trustee and Columbus Works Virginia Trust filed a

---

[1] March 10, 2008 Declaration of Gerard A. McHale, Jr., ¶ 7, Doc. 44-7, PageID 749, 751; October 25, 2013 Declaration of Janie Kashiwa-Li, ¶ 7, Doc. 36-1, PageID 326.

[2] McHale Decl., ¶ 8, PageID 751.

[3] Kashiwa-Li, Decl., ¶ 7, PageID 326.

[4] McHale Decl., ¶ 10, PageID 752.

[5] Defendants' February 14, 2013 Counterclaim, ¶ 10.

[6] *Id.*, ¶ 11.

Chapter 11 bankruptcy in the Southern District of New York.[7] On October 19, 2007, Cordell filed suit in the Supreme Court of New York and issued a notice of foreclosure sale on its note and mortgage.[8] In November 2007, additional Okun entities filed bankruptcy, automatically staying Cordell from proceeding on the foreclosure sale.

During 2007-08, the Lucent lease was generating about $247,000 a month in rent.[9] Under the Master Lease, the TICs were entitled to $166,667 a month base rent, but the monthly debt service on the $26.5 million Cordell loan was $193,000.[10]

In bankruptcy, the bankruptcy trustee, Gerard A. McHale, Jr., took control of the Okun entities' interests in the master lease and the $27 million loan and mortgage as part of the bankruptcy estate. The trustee assumed control of 6200 East Broad.[11] Lucent's monthly rental payments were collected by the trustee, and he made a monthly $193,000 protection payment to Cordell

On November 15, 2007, the TICs contacted Vorys seeking legal representation in the Southern District of New York bankruptcy proceedings. Over the succeeding weeks,

---

[7]*Id.*, ¶ 12.

[8]*Id.*, ¶ 13.

[9]There were also large CAM payments to cover the expenses associated with the property's power plant that generated electricity used by Lucent and a neighboring hospital. See, January 25, 20108 Management Committee Report to TICs, Doc. 36-1, PageID 358.

[10]McHale Decl., ¶ 11, PageID 752.

[11]*Id.*, ¶ 10.

3

the TICs drafted and executed an Agreement Among Tenants in Common, dated November 20, 2007, that engaged counsel and established a management committee to make decision about that litigation and implementing the TICs goals for protecting their interests in 6200 East Broad.[12]

On December 19, 2007, a majority of the TICs met with Vorys partner Randall LaTour.[13] One problem the TICs wanted to solve was that the bankruptcy trustee was collecting rent from Lucent and making protection payments to Cordell but was not paying them the rent they were entitled to under the master lease.[14] According to two members of the management committee from TICs who are defendants in this lawsuit, Stephen B. Fink and Melvin Pearl, LaTour

> recommended filing a "motion to cause (the) Trustee to assume or reject the Master Lease." As he explained "forcing the lease out of the hands of the Trustee was the end game." He also explained at that time that Cordell could foreclose on the Trust Note and Mortgage, but indicated that this was not imminent as "Cordell (had) to go through the Bankruptcy Court to do anything. . .because of the fact that the Trust is in Chapter 11 Bankruptcy." Finally, LaTour stated that there might be a fraud claim that could be pursued against Cordell, but that his claim was still an 'embry-

---

[12]November 10, 2013 Declaration of A. Sean Aguilar, ¶¶ 12-13 and Ex. 1, Doc. 36-2, PageID 402-03 and 411-14. Members of the management committee were selected after the TICs' December 19, 2007 meeting with Randall LaTour. January 14, 2014 Declaration of Stephen B. Fink, ¶ 7, Doc. 44-4, PageID 713. The original members of the committee were Fink, Mel Pearl, Janie Kashiwa-Li, Chuck Shorley and Tony Cucalon. *Id.*

[13]Fink Decl., ¶ 6, PageID 712-13; Kashiwa-Li, Decl., ¶ 14, PageID 327.

[14]Kashiwa-Li, Decl., ¶ 14, PageID 327.

onic idea' and need(ed) to be investigated further in order to pursue . . .
."[15]

The management committee met on January 4, 2008. The management committee

reports to all the TICs for that meeting confirmed that there were property management

_____

[15]Fink Decl., ¶ 6, PageID 712-13; January 2, 2014 Declaration of Melvin Pearl, ¶ 8,
Doc. 44-3, PageID 707. In contrast, Kashiwa-Li, a management committee member from
a TIC that paid its share of the Vorys legal bill at issue in this lawsuit, asserts:

> From the beginning of Vorys' representation of the TICs, the TICs goal
> was to gain control of the Property and the rent from Lucent in order to
> manage the Property in such a way as to keep Lucent as the major tenant
> and otherwise maintain or increase the value of the Property owned by
> the TICs. . . . LaTour explained to the TICs that one strategy to gain con-
> trol of the Property was to file a claim for rent not being paid by the Trust-
> ee to the TICs (the "Administrative Rent Claim") which would require the
> Trustee to either assume the Master Lease and begin paying rent to the
> TICs or reject the Master Lease and return control of the property to the
> TICs. Mr. LaTour posed the question to the TICs, "is this desirable?"

Kashi-Li Decl., ¶ 15, PageID 327-28. Kashi-Li's notes from that meeting read, in relevant
part:

> . . . If we try to reject the master lease at this point, we may accidentally let
> Lucent get away. Their lease could disappear and we have cut off our rev-
> enue stream. As to the timetable of a decision. I see it as being possibly a
> decision in January or February. Question is, is this desirable?

Kashi-Li's Notes from the December 19, 2007 meeting, p. 2, Doc. 36-1, PageID 338. Later,
in response to Pearl's question asking him to "summarize your next steps", LaTour
responded:

> Lease and Rents: We want to make a motion to require payment of Ad-
> ministrative Rents. And a Motion to cause Trustee to assume or reject the
> master lease. Forcing the lease out of the Trustee's hands is the end game.

*Id.*, p. 7, PageID 343. In response to a question about how Cordell got a mortgage
without the TICs knowing about it, LaTour said, in part:

> In order to foreclose, Cordell would have to foreclose on Virginia Trust,
> and they can't do that now because Virginia Trust is in bankruptcy. Then
> after that foreclosure, Cordell would take possession of our note and fore-
> close on us.

*Id.*

problems at the 6200 East Broad property. The water company had delivered a shut off notice, and the State of Ohio issued a final notice for nonpayment of workers compensation.[16] Of further concern, Lucent, whose lease was set to expire January 31, 2009,[17] had "expressed an interest in negotiating a different deal."[18] The report also stated that the TICs would soon be filing a motion to require payment of administrative rent and a "[m]otion for relief from stay and termination of the Lease and/or for 'adequate protection.'"[19] On January 18, 2008, LaTour wrote an email to the members of the management committee asking:

> Is there any reason for me not to file a demand for payment of rent and other administrative claims to which you are entitled? We can always defer or withdraw the motion if need be, but filing it will turn up the heat on the Trustee. Please advise whether I should file or hold off.[20]

At its January 20 meeting, the management committee decided to go forward with the administrative rent claim.[21] The management committee's January 25, 2008 report to the TICs contained this discussion of their mortgage and Cordell:

---

[16]January 5, 2008 CW Management Committee Report to Owners, p. 1, Doc. 36-1, PageID 348.

[17]Transcript of April 16, 2008 Hearing, *IPofA Columbus Works, LLC v. Columbus Works Virginia Trust*, Case No. 08-01138 (U.S. Bankruptcy Court for the S.D. N.Y.), p. 52, PageID 827.

[18]*Id.*, p. 2, PageID 349.

[19]*Id.*

[20]Doc. 36-1, PageID 351.

[21]Kashiwa-Li Decl., ¶ 17, PageID 328.

6

Our attorneys said that the nature of our mortgage is a limited recourse mortgage with "springing recourse" in it. In other words, if our master lease is rejected in Bankruptcy, then this automatically puts our first mortgage in default. So the downside of aggressively getting the Trustee to reject the master lease is that we will be throwing our mortgage into default.

Cordell has taken some legal action. They are trying to get the Virginia Trust Bankruptcy dismissed out of Bankruptcy Court (or get relief from the bankruptcy stay?). The hearing for this is set for January 25, 2008. If they get the Virginia Trust bankruptcy dismissed, the risk to us is that Cordell can then 1) foreclose on the mortgage they had with the Virginia Trust, and once that happens they can 2) take possession of our first mortgage, and foreclose on our first mortgage, if it is in default.

Randy has spoken to the Trustee about what he plans to do in the Jan 25th Cordell hearing. The Trustee seems confident Cordell's motion to dismiss the bankruptcy will be denied. It doesn't seem necessary for us (through our attorneys) to insert ourselves into this, as the Trustee is already planning to say and do what we wanted to in the hearing. We will keep you posted on the hearing, as soon as we hear anything.[22]

Management committee members Pearl and Fink assert that:

Based on the understanding that the motion could be withdrawn if it endangered the TICs position with respect to the Real Property, the Management Committee authorized the filing of the motion. At the time of this authorization, however, the Management Committee had an understanding with Vorys that Vorys would take all steps necessary in order to preserve the status quo and avoid a default on the Trust Note and Mortgage.[23]

---

[22]January 25, 2008 Management Committee Report to Owners, p. 2, Doc. 36-1, PageID 356. LaTour advised the TICs that once the bankruptcy trustee rejected the master lease, Cordell would seek relief from the automatic stay, conduct an Article 9 sale, and begin foreclosure proceedings. June 27, 2013 Deposition of Randall LaTour, pp. 50-51, Doc. 44-10, PageID 851.

[23]Pearl Decl., ¶ 11, PageID 708; Fink Decl., ¶ 9, PageID 713.

The management committee report also indicated that a consultant advised that the Trustee's property manager for 6200 East Broad, Boardwalk, was not properly managing the property.[24] Further, Lucent did not want to renew its lease on the current terms, and the bankruptcy trustee did not want the TICs to talk with Lucent to negotiate a new deal.[25] On February 7, 2008, LaTour sent an email to members of the management committee confirming that the TICs had instructed Vorys to "pursue the 'rejection' approach to removing the Master Lease as an impediment . . . ."[26]

On January 24, 2008, Vorys filed a motion in the bankruptcy court seeking payment of an alleged administrative claim for unpaid rent, additional rent, taxes, property insurance and other items by IPofA Columbus, and other IPofA debtors, McHale and the 1031 Debtors. The bankruptcy trustee concluded that since the Lucent lease generated revenue of approximately $247,000 a month and that amount was insufficient to

---

[24]Doc. 36-1, PageID 355. The consultant said that Boardwalk had visited the property only once in six months. Lucent refused to "even talk to Boardwalk." Invoices were not being paid. On-site property managers had been instructed to forward bills to Boardwalk, but they had no way of determining whether Boardwalk had paid a bill. Health insurance premiums for employees had not been paid despite the fact that health insurance premiums had been deducted from their paychecks. Relationships with local vendors had been lost or would soon be lost. Vital vendor contracts for 2008 had not been secured. Most of the vendors had not been paid since the summer of 2007. *Id.*, PageID 357. The consultant also discussed problems with the property's powerhouse, which was expensive to operate and was generating more power than Lucent needed. *Id.*, PageID 358-59.

[25]*Id.*, PageID 359. Lucent wanted to reduce its rental space from 1,384,000 square feet to 300,000 square. McHale Decl., ¶ 14, PageID 752-53.

[26]Doc. 36-1, PageID 354.

cover both the monthly Cordell loan payments ($193,000) and the TICs' monthly rent payments ($166,667), "the economic reality is that the structure set up by Okun is simply not viable."[27] Consequently, although he had "hoped that a consensual resolution could be reached under which the Property would be sold, having received the Owners' Motion, the only option left to IPofA Columbus is to reject the Master Lease."[28]

On March 6, 2008, LaTour transmitted by email a final version of an agreed order rejecting the master lease to the management committee, asking that they contact him immediately if it should not be signed.[29] On March 7, 2008 LaTour emailed the management committee that Cordell filed a motion the previous evening for relief from the stay.[30] Later that same day, he emailed the committee that the bankruptcy trustee and

---

[27]McHale Decl., ¶ 16, PageID 753.

[28]*Id*. The trustee's consultant, Deloitte FAS, assessed 6200 East Broad as having a value ranging from $27,729,000 to $33,481,000. February 1, 2008 Declaration of John P. Sordillo, ¶ 19, p. 9, Doc. 44-8, PageID 763. There was no equity in the collateral securing Cordell's $26.5 million loan, "although the value of the property is higher than the mortgage that is pledged as collateral . . . ." *Id*., p. 15, PageID 769. Deloitte FAS concluded that

> A multi-party arrangement among the TICs, Columbus Works Virginia Trust and IPofA Columbus Works Lease Co. could give the IPofA debtors an opportunity to capture equity in the property, which if sold at the high end of the range of appraised values would both satisfy Cordell's secured claim and leave a surplus to be divided among the TICs and the IPofA debtors.

*Id*., ¶ 46.

[29]A. Sean Aguilar Decl., ¶ 18 and Ex. 6, PageID 404-05 and 454.

[30]*Id*., ¶ 19 and Ex. 7, PageID 405 and 460. His email further advised: "We all saw this coming so I do not think it should dissuade us from getting control of the property via the lease rejection. I will consider whether any other actions are needed before

Cordell had reached an agreement that Cordell be relieved from the stay. He said that the TICs had no basis to contest Cordell's motion to seek relief from the stay, but that he would do additional research about whether they should file an adversary proceeding contesting the enforceability of the mortgage before a March 28 bankruptcy court hearing on Cordell's motion.[31] At a March 11 bankruptcy hearing, the trustee's attorney, Jonathan Flaxer, told the judge that the TICs and Lucent had entered a stipulation to permit McHale to reject the master lease.[32] During the hearing, Cordell's counsel said his client did not object to rejection of the master lease, but that it had two concerns. First, the $195,000 mortgage payment for February had been paid, but the March 1 payment had not been made. Consequently, Cordell objected to releasing all the monies the trustee was holding without paying it $195,000. Cordell asked that the bankruptcy judge's order "provide that the $195,000.00 which is the amount due for March be paid . . . ."[33] Cordell also asked that the judge's order be entered "without prejudice to the rights of both the lender and Cordell with respect to the TICs and . . . we don't want it to be determinative or prejudicial to Cordell or the lender . . . from asserting or pre-

_____

March 28." *Id.*

[31]*Id.*, ¶ 20 and Ex. 8, PageID 405 and 461.

[32]March 11, 2008 Transcript of Hearing on Application for Administrative Expenses and Motion Authorizing Rejection of Certain Leases, *In re 1031 Tax Group, LLC and Investment Properties of America, LLC.*, Case Nos. 07-11448 (MG) and 07-13621 (United States Bankruptcy Court for the Southern District of New York), p. 5, Doc. 44-6, PageID 737.

[33]*Id.*, pp. 7-8, PageID 739-40.

serving rights that they may or may not have."[34] The trustee's lawyer responded that once the stay was lifted the trustee would be criticized if he made a protection payment to the secured creditor "because the purpose of the adequate protect-ion payment is to protect the secured creditor because of the imposition of the stay."[35] As to the cash in the hands of the property manager for 6200 East Broad, all of it was going to the TICs. "If they don't make a payment to Cordell, Cordell has its remedies whatever they may be. We're out of this."[36] LaTour argued that Cordell's concerns were premature because it was not yet the owner of the $27 million IPofA Columbus Works Virginia Trust note.[37] Further, LaTour said that "nobody is declaring that the mortgage payment will not be made."[38] The bankruptcy judge's order, he maintained, "simply directs Lucent to start making payments to the TIC. Where the money goes from the TICs is all driven by

---

[34]*Id.*, p. 8, PageID 740. Cordell's lawyer asked that the judge's order contain "a reservation of rights as to Cordell's rights with respect to the TICs." *Id.* Cordell also asked that all Lucent rent funds held by the trustee not be released on the ground that under the loan agreement it had asserted liens on those funds. *Id.*

[35]*Id.*, p. 10, PageID 472.

[36]*Id.*, p. 11, PageID 743.

[37]*Id.*, p. 12. PageID 744. He asserted that the Virginia Trust mortgage required a notice of default before an assignment of rents would be in place. *Id.*

[38]*Id.*

11

other documents that are already in place."[39] The bankruptcy judge ruled that Cordell's objections were untimely and approved the agreed order. [40]

That afternoon, LaTour emailed the members of the management committee that the bankruptcy judge had approved the order rejecting the master lease. He said that "Cordell was very concerned the order required the turn over of all monies from the Trustee to the TICS because Cordell had not yet been paid the March Mortgage payment."[41] He said that the judge accepted his argument that Cordell had not yet (1) exercised its rights against Columbus Works Virginia Trust; (2) issued a default notice; or (3) demonstrated that the TICs had refused to make the March mortgage payment.[42] He told the TICs:

> I am sure that Cordell will rapidly take steps to invoke its Article 9 remedies against Columbus Works Virginia Trust. Bearing in mind that the Note contains a "springing recourse" provision for conversion of rent from the Lucent Lease, I think it would behoove the TICS to pay the March Mortgage payment from the funds turned over from the Trustee. After the TICS have determined an over-all litigation strategy, the TICS can always adopt a "withholding of payment" strategy. However, as we previously discussed, it would be imprudent (and perhaps far worse) for a group of 5 TICS to take actions that created personal liability for the other 28 TICS without prior authority.[43]

---

[39]*Id.*

[40]*Id.*, p. 14, PageID 746.

[41]January 6, 2014 Declaration of Richard B. Reiling, Ex. B, Doc. 44-1, PageID 692

[42]*Id.*

[43]*Id.*

On March 12, 2008, the bankruptcy judge filed the agreed order rejecting the master lease and resolving the TICs' administrative rent claim.[44] LaTour communicated a demand to the bankruptcy trustee's property manager, Boardwalk, that it turnover the Lucent lease payment monies it held forthwith.[45] On March 13, 2008, LaTour email-ed the management committee members that Vorys had received $841,969.26 from Boardwalk.[46]

A majority of the TICs held a conference call with LaTour on March 13, 2008.[47] LaTour said it was "extremely positive" that the bankruptcy judge had rejected the master lease which would permit the TICs to negotiate directly with Lucent.[48] Next LaTour addressed Cordell:

> . . . Cordell attempted at the hearing for the rejection of the lease to have the court direct that the monies be paid to Cordell, instead of going to the TICs. I was successful in resisting their efforts, but Cordell is not going to stop making that effort.

---

[44]*Id.*, ¶ 21, PageID 405.

[45]*Id.*, ¶ 21 and Ex. 9, PageID 405 and 462-66.

[46]A. Sean Aguilar Decl., ¶ 23 and Ex. 11, PageID 405-06 and 475. The email in-dicated that likely most of the money represented CAM, money paid by Lucent to cover the expenses from the operation of the power plant, and not rent surplus. The CAM money was to pay suppliers and other creditors. *Id.*, PageID 475.

[47]Pearl Decl., ¶ 13, PageID 709; Fink Decl., ¶ 11, PageID 713-14; Kashiwa-Li Decl., ¶ 27, PageID 331.

[48]Note from March 13, 2008 Columbus Works TIC Owners Meeting, Kashiwa-Li Decl., Ex. 14, Doc. 36-1, PageID 381.

> In that regard I received yesterday a copy of a notice from Cordell, seek-
> ing to foreclose it[s] security interest in the note and mortgage as between
> it and CW-Virginia Trust. What that does is put Cordell in the shoes of the
> VT and then deal directly with the TICs. By deal, that could be an agree-
> ment, but it could also be a legal action to enforce the mortgage.[49]

In response to a question about the status of the mortgage, LaTour said that the bank-
ruptcy trustee's attorney said he did not know the status of the mortgage payments.
LaTour said that the TICs' position would be that they are current "until someone
proves otherwise."[50] He said that whether the TICs were in default depended on what
an accounting showed.[51] The TICs' strategy would be to "accomplish a restructuring of
the mortgage obligation" because the "the payment stream that is currently being paid
by Lucent will only give you a $20,000 surplus on the rent side. . . . At that kind of a
rate, rounded to $250,000 per year, it would take you 100 years to recoup a $25M in-
vestment."[52] LaTour said the "worse case scenario" was that Cordell would "want you
to acknowledge just that the mortgage is enforceable and pay all the monies to them."[53]

When asked whether they should sue Cordell to invalidate the mortgage, LaTour
responded that the bankruptcy trustee did make payments on the mortgage. He recom-
mended suing to challenge the enforceability of the mortgage, but that they did not

---

[49]*Id.*, PageID 381.

[50]*Id.*, PageID 382.

[51]*Id.*

[52]*Id.*

[53]*Id.*, PageID 383.

have to stop paying on the note to challenge it in court.[54] Mel Pearl then asked: "If we did that and paid [the mortgage] during the inception of the litigation, are we still retaining some capital, some rent proceeds in our treasury so we can fund what we are doing?" LaTour responded:

> Well the only payments to which they would be entitled would be the amount of money necessary to service the mortgage monthly payment. . . . To the extent there was an overage from what Lucent was paying, an amount in excess of the amount of the monthly payment, that would be available to do just what you said.[55]

LaTour believed filing suit to invalidate the mortgage was necessary to have a successful negotiation with Cordell to restructure the note and mortgage.[56] He cautioned that "we should not fool ourselves to think that just by filing a lawsuit that we are going to make a $27 million obligation go away. It is going to be a difficult case to bring in if you go all the way to a trial."[57] LaTour said he assumed that the TICs would continue to make monthly mortgage payments until they, as a group, agreed not to. Mel Pearl responded, "Yes, that's correct. We should continue to pay mortgage we ought to

---

[54]*Id*. LaTour said:
Now I don't believe that you would necessarily have to stop paying the [mortgage] while you have this fight about enforceability. I believe that if you are paying the [mortgage] as you go, then you will not be in default, but you can still have the dispute about whether or not the mortgage is enforceable.
PageID 383-84.

[55]*Id*., PageID 384.

[56]*Id*., PageID 385.

[57]*Id*., PageID 386.

continue to make it, certainly for the next couple of months, then revisit that issue."[58]

After LaTour left the conference call, Mel Pearl said:

> I think we are positioned absolutely the best we could be under the circumstances. . . everything that has happened thus far, put us in the best position that we could possibly be in. We've got a long way to go but I think we've set it up so that we're in control, and whatever happens next will be in the hands of the gods and the courts . . . but we've now finally controlled our destiny in some way.[59]

By a letter dated March 27, 2008, Cordell advised the TICs that it had "conducted a UCC sale" on March 24 and "became the owner and holder" of the Columbus Works Virginia Trust note evidencing a $27 million loan to IPofA Columbus Works and the accompanying mortgage. Cordell gave the TICs a notice of acceleration and made a demand for payment of the entire remaining amount due on the loan, asserting that the March 2008 loan payment had not been made.[60] Melvin Pearl and Stephen B. Fink assert they were surprised to learn that Cordell claimed that the note was in default.[61] They blamed Vorys for not making the March payment and throwing the TICs into default.[62] Pearl asserts that the TICs were forced to settle the foreclosure action Cordell filed

---

[58]*Id.*, PageID 390.

[59]*Id.*, PageID 394-95.

[60]Reiling Decl., ¶ 5 and Ex. C, Doc. 44-1, PageID 686-87 and 694.

[61]Pearl Decl., ¶ 15, PageID 710; Fink Decl., ¶ 13, PageID 714.

[62]Pearl Decl., ¶ 15-17, PageID 710; Fink Decl., ¶ 13-16, PageID 714

against them in the Franklin County Common Pleas Court "on extremely unfavorable terms."[63]

Vorys did file an adversary proceeding on behalf of the TICs against Cordell and the Columbus Works Virginia Trust in Bankruptcy Court.[64] As part of this action, La-Tour argued that Cordell was in contempt for allegedly violating the Court's order of March 11, 2008 by attempting to exercise its rights under Columbus Works Virginia Trust note and mortgage.[65] LaTour sought injunctive relief that would have placed the parties in the position they were in when the bankruptcy court issued its orders permitting the trustee to reject the master lease and lift the stay.[66] The bankruptcy judge ruled that Cordell was not in contempt of the court's orders.[67]

On May 22, 2008, Cordell filed a foreclosure proceeding on the real property.[68] Although Vorys initially represented defendants in connection with the action, they

---

[63]Pearl Decl., ¶ 18, PageID 711.

[64]*IPofA Columbus Works, LLC v. Columbus Works Virginia Trust*, Case No. 08-01138 (U.S. Bankruptcy Court for the S.D. N.Y.)

[65]Transcript of April 16, 2008 Hearing, *IPofA Columbus Works, LLC v. Columbus Works Virginia Trust*, Case No. 08-01138 (U.S. Bankruptcy Court for the S.D. N.Y.), p. 16, PageID 791.

[66]*Id.*, pp. 38-39, PageID 813-14.

[67]*Id.*, pp. 19-20, PageID 794-95.

[68]February 14, 2013 Counterclaim, ¶ 36, Doc. 17, PageID 126; Pearl Decl., ¶ 18, Doc. 44-3, PageID 711.

retained new counsel in February 2009.[69] In June 2008, the TICs authorized Vorys to dismiss the adversary proceeding and litigate the mortgage issues in the foreclosure action.[70]

Vorys maintains that the IPofA Columbus Works 1 through 6, 8 through 18, 21 through 23, 25, 27 through 29, 31 and 32 entities owe a total of $251,130.62 for professional services, expenses and disbursements.[71]

Counterclaims. Defendants filed counterclaims against plaintiff asserting fraud and intentional misrepresentation, legal malpractice, breach of fiduciary duty, breach of contract, unjust enrichment, and for an accounting. On June 5, 2013, the Court dismissed defendants' counterclaims as barred by the statute of limitations for legal malpractice.[72]

The defendant TICs' answer to the amended complaint pleads the defenses that Vorys committed legal malpractice entitling them to a set-off and compensatory damages and that Vorys materially breached its agreement with them.[73] The defendant TICs maintain that Vorys, through LaTour, advocated the strategy of forcing the bankruptcy

_____

[69]*Id.*

[70]Aguilar Decl., ¶¶ 39-40, Doc. 36-2, PageID 409.

[71]November 14, 2013 Affidavit of Randall D. LaTour, ¶¶ 17-19, Doc. 36-3, PageID 513-14.

[72]June 5, 2013 Order, pp. 10-13, Doc. 31, PageID 297-300.

[73]Answer to Amended Complaint, Fifth and Sixth Defenses, ¶¶ 14 and 15, Doc. 16, PageID 109.

trustee to abandon the master lease in accordance with the provisions of 11 U.S.C. § 365(a). Yet, no later than February 28, 2008, LaTour knew that the bankruptcy trustee would not make the March 1 protection payment.[74] The defendant TICs assert that Vorys failed to make the March payment to Cordell despite their clear expectations that the payment would be made.[75] They also allege that LaTour gave them inaccurate or misleading information when they asked him about Cordell's acceleration of the note and demand for payment of the entire balance of the note.

## II.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the absence or presence of a genuine dispute must support that assertion by either "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an ad-

---

[74]LaTour Dep., p. 86, Doc. 44-10, PageID 860.

[75]It is uncontroverted that the TICs were not in a position to pay the note on March 1 because they had insufficient funds on hand. Cordell maintains that the default occurred on March 1, 2008. The TICs did not receive the $841,969.26 from Broadwalk until March 13, 2008.

19

verse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party may object that the cited material "cannot be presented in a form that would be admissible in evidence," and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 56 advisory committee's note. If a party uses an affidavit or declaration to support or oppose a motion, such affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

While the court must consider the cited materials, it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). However, "[i]n considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III.    Discussion

The uncontroverted evidence shows that on November 15, 2007, defendants and Vorys entered into an engagement agreement for the performance of legal services. Each of the defendants promised to pay Vorys for its legal services at Vorys' normal hourly rates, plus reimbursement for expenses and disbursements advanced by Vorys. The TIC owners made regular payments on the invoices for Vorys' legal services performed through May 31, 2008, but by December 11, 2008, the account balance due for unpaid invoices was in the amount of $176,986.31. Vorys requested payment in full on the arrearage of unpaid invoices and an additional retainer in advance of future proceedings. On January 21, 2009, the Management Committee for the TIC owners responded that they were unable to meet the payment conditions and terminated the agreement for legal services. Defendants have failed and refused to pay the remaining balance due for legal services plus reimbursement for expenses and disbursements. Vorys maintains that there is now due and owing from defendants the total sum of $251.130.62 plus prejudgment interest.

When seeking to collect fees, an attorney has the burden of establishing the reasonableness of an unpaid fees:

> [T]he attorney has the burden of establishing the reasonableness and fairness of fees. [*Jacobs v. Holston*, 70 Ohio App. 2d 55 (Ohio App. 10 Dist. 1980).] Where, prior to employment, the attorney and client have reached an agreement as to the hourly rate to be charged and the amount of the retaining fee, but the agreement fails to provide for the number of hours to be expended by the attorney, in an action for attorney fees the burden of proving that the time was fairly and properly used and the burden of showing the reasonableness of work hours devoted to the case rest on the attorney. *Id*.

21

*Climaco, Seminatore, Delligatti & Hollenbaugh v. Carter*,  100 Ohio App.3d 313, 323 (Ohio

App. 10 Dist., 1995).

> The answer to the amended complaints states in pertinent part:

> 15.    Plaintiff has committed legal malpractice in connection with its rep-
> resentation of Defendants and Defendants are entitled to set-off
> and compensatory damages.
> . . .
> 16.    Plaintiff has materially breached its agreement with Defendants
> and Plaintiff is entitled to collect nothing in connection therewith.

Doc. 16 at PageID# 109. Here, defendants asserted a claim for set-off rather than recoup-

ment. Defendants' brief made no response to plaintiff's assertion that failure to raise the

affirmative defense of recoupment results in waiver of the defense. By failing to re-

spond to plaintiff's argument, defendants have abandoned any claim that they should

be entitled to raise recoupment as an affirmative defense in spite of the failure to do so

in their answer.

Under Ohio law, set-off and recoupment are distinct legal concepts. Recoupment

is a defense which arises out of the same transaction as the plaintiff's claim asserting the

right to reduce the amount demanded by the plaintiff. This defense can only be used to

the extent that is sufficient to satisfy the plaintiff's claim. *Riley v. Montgomery*, 11 Ohio

St. 3d 75, 77 (1984). Recoupment, as a defense, survives as long as the main action is

timely brought. *Id.* at 78. Set-off, on the other hand, "is that right which exists between

two parties, each of whom under an independent contract owes a definite amount to the

22

other, to set off their respective debts by way of mutual deduction." *Witham v. South Side Building & Loan Ass'n of Lima*, 133 Ohio St. 560, 562 (1938).

The failure to properly plead the affirmative defense prevents defendants from raising recoupment as a possible defense to Vorys' claim for attorney fees. *See Haddad v. English,* 145 Ohio App. 3d 598, 602-603 (Ohio App. 9 Dist. 2001). *See also Ignash v. First Service Federal Credit Union*, No. 01AP-1326, 2002 WL 1938412, at *5 (Ohio App. 10 Dist., Aug. 22, 2002) ("[R]ecoupment is an affirmative defense that must be asserted in an answer or be waived."). The Court has previously held that defendants' counterclaims were barred by the statute of limitations. Under Ohio law, if the statute of limitations has run for the underlying cause of action, set-off is barred. *Riverside Methodist Hosp. Ass'n of Ohio v. Guthrie*, 3 Ohio App.3d 308, 311 (Ohio App.1982)(citing *Summers v. Connolly*, 159 Ohio St. 396 (1953)) ("If the statute of limitations had run, either a setoff or counterclaim would be barred.").

Defendants also argue that plaintiff's fees for legal services are not reasonable because of the alleged malpractice of LaTour. Because defendants' claim for set-off is barred by the statute of limitations and they failed to plead the affirmative defense of recoupment, defendants cannot use this legal theory to demonstrate that plaintiffs' fees are not reasonable. Defendants are not entitled to rely on any alleged malpractice to demonstrate that plaintiff breached its contract. Defendants have failed to offer any evidence supporting their allegation that the attorney fees sought by plaintiff are not

reasonable other than the evidence relating to their allegations of malpractice.  As a result, plaintiff is entitled to judgment as a matter of law.

Plaintiff Vorys, Sater, Seymour and Pease LLP's ("Vorys") motion for summary judgment (doc. 36) is GRANTED. The Clerk of Court is DIRECTED to enter judgment against defendants in the amount of $251.130.62 plus prejudgment interest. This case is closed.

s/Mark R. Abel
United States Magistrate Judge